**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN HOARE, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ODDITY TECH LTD., ORAN HOLTZMAN, LINDSAY DRUCKER MANN, SHIRAN HOLTZMAN-EREL, MICHAEL FARELLO, and LILACH PAYORSKI, | |
| Defendants. | |

Plaintiff Brian Hoare ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ODDITY Tech Ltd. ("Oddity" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Oddity securities between

1

July 19, 2023 and May 20, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.   Oddity describes itself as "a consumer tech platform that is built to transform the global beauty and wellness market."  The Company purports to serve customers worldwide through its artificial intelligence- ("AI") driven online platform, using data science, machine learning, and computer vision capabilities to identify consumer needs, as well as develop solutions in the form of beauty and wellness products.

3.   On or around July 19, 2023, Oddity conducted its initial public offering ("IPO"), issuing over 12 million of its Class A ordinary shares to the public at the offering price of $35.00 per share for approximate proceeds, after applicable underwriting discounts and commissions, and before expenses, of $57.26 million to the Company and $337.83 million to certain selling shareholders, including, *inter alia*, the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CEO").

4.   Leading up to and following Oddity's IPO, Defendants widely portrayed the Company as a disruptor in the cosmetics industry.  In particular, Defendants differentiated Oddity from traditional brick-and-mortar retailers by asserting that the Company used, *inter alia*, proprietary AI technologies to target consumer needs.  With investors and analysts increasingly attentive to the potential benefits and competitive advantages of AI-powered technologies, Oddity's purportedly differentiated approach to the cosmetics industry garnered praise and attention.

5.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Oddity overstated its AI technology and capabilities, and/or the extent to which this technology drove the Company's sales; (ii) Oddity's repeat purchase rates and revenues were, at least in part, derived from unsustainable and deceptive sales and advertising practices; (iii) Oddity downplayed the true scope and severity of ongoing civil litigation against the Company and/or its subsidiaries; and (iv) as a result, Oddity's public statements were materially false and misleading at all relevant times.

6.    On May 21, 2024, NINGI Research ("Ningi") published a report (the "Ningi Report") regarding Oddity, alleging that the Company "completely misled investors about every critical aspect of its business[.]"  In particular, the Ningi Report alleged, *inter alia*, that Ningi "talked to former employees who told [Ningi] that the [Company's] AI is nothing but a questionnaire"; that Oddity's lauded "repeat purchase rates" are attributable to "customers unknowingly enter[ing] into non-cancelable plans" that allow the Company "to recognize repeat purchases in the following quarters even though the customers don't want the product"; and that Ningi had "found hundreds of undisclosed lawsuits filed against ODDITY and its subsidiaries in the US and Israel, frequently alleging unpaid bills and violations of consumer protection laws," including multiple class action lawsuits filed within the past several years.

7.    On this news, Oddity's Class A ordinary share price fell $3.02 per share, or 7.37%, to close at $37.97 per share on May 21, 2024.  Oddity's Class A ordinary share price continued to decline by an additional $1.30 per share, or 3.42%, over the following two consecutive trading sessions, closing at $36.67 per share on May 23, 2024.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Oddity's IPO, the Company issued over 12 million of its Class A ordinary shares to the public.  Oddity's Class A ordinary shares trade in the U.S. on the Nasdaq Global Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Oddity's securities located in the U.S., some of whom undoubtedly reside in this District.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.    Plaintiff, as set forth in the attached Certification, acquired Oddity securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Oddity is organized under the laws of the State of Israel ("Israel"), with principal executive offices located at 8 Haharash Street, Tel Aviv-Jaffa, 6761304, Israel.   The Company's Class A ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "ODD."

15.     Defendant Oran Holtzman ("Holtzman") has served as Oddity's CEO and a Director of the Company at all relevant times.  Defendant Holtzman is also a Co-Founder of the Company.

16.     Defendant Lindsay Drucker Mann ("Mann") has served as Oddity's CFO at all relevant times.

17.     Defendant Shiran Holtzman-Erel ("Holtzman-Erel") has served as Oddity's Chief Product Officer and a Director of the Company at all relevant times.  Defendant Holtzman-Erel is also a Co-Founder of the Company and Defendant Holtzman's sister.

18.     Defendant Michael Farello ("Farello") has served as a Director of Oddity at all relevant times.

19.     Defendant Lilach Payorski ("Payorski") has served as a Director of Oddity at all relevant times.

20.     Defendants Holtzman, Mann, Holtzman-Erel, Farello, and Payorski are collectively referred to herein as the "Individual Defendants."

21.     The Individual Defendants possessed the power and authority to control the contents of Oddity's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Oddity's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions

with Oddity, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Oddity and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Oddity describes itself as "a consumer tech platform that is built to transform the global beauty and wellness market."  The Company sells beauty, hair, and skin products under the "Il Makiage" and "SpoiledChild" brands.

24.     Oddity purports to serve customers worldwide through its AI-driven online platform, powered by its so-called "PowerMatch" and "SpoiledBrain" technologies, which purportedly use data science, machine learning, and computer vision capabilities to identify consumer needs, as well as develop solutions in the form of beauty and wellness products.

25.     On June 23, 2023, Oddity filed a registration statement (the "Registration Statement") on Form F-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on July 18, 2023.  Each of the Individual Defendants signed or authorized the signing of the Registration Statement.

26.     On or around July 19, 2023, Oddity conducted its IPO, issuing over 12 million of its Class A ordinary shares to the public at the offering price of $35.00 per share for approximate proceeds, after applicable underwriting discounts and commissions, and before expenses, of

$57.26 million to the Company and $337.83 million to certain selling shareholders, including Defendants Holtzman, Mann, and Payorski.

27.     On July 20, 2023, Oddity filed a prospectus (the "Prospectus" and, together with the Registration Statement, the "Offering Documents") on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

28.     Leading up to and following Oddity's IPO, Defendants widely portrayed the Company as a disruptor in the cosmetics industry.  In particular, Defendants differentiated Oddity from traditional brick-and-mortar retailers by asserting that the Company used, *inter alia*, proprietary AI technologies to target consumer needs.  With investors and analysts increasingly attentive to the potential benefits and competitive advantages of AI-powered technologies, Oddity's purportedly differentiated approach to the cosmetics industry garnered praise and attention.

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on July 19, 2023, when Oddity's Class A ordinary shares began publicly trading on the NASDAQ pursuant to the materially false or misleading statements and omissions in the Offering Documents.  With respect to Oddity's purported proprietary AI technology and capabilities, the Offering Documents stated, *inter alia*:

> We deploy algorithms and machine learning models leveraging user data seeking to deliver a precise product match and seamless shopping experience.

> * * *

> Our proprietary algorithms and machine learning models match customers with accurate complexion and beauty products. Using artificial intelligence, or AI, PowerMatch and SpoiledBrain help users identify the correct products, formulations, and shades, reducing the risk of incorrect selection and eliminating the need to physically try on products in-store. We use many real-time predictions drawn from our pool of user data and are constantly improving our models to increase accuracy and conversion.

\* \* \*

Our hyperspectral vision technology can detect 31 wavelengths that are invisible to the human eye. By applying unique, physics-based AI technology to recover and interpret this hyperspectral information, we can analyze skin and hair features, detect facial blood flows, monitor heart-rate, and create melanin and hemoglobin maps.

30.     Indeed, the Offering Documents attributed Oddity's "repeat purchase rates," purportedly loyal customer base, and overall sales and competitive advantages to its AI-powered and online business model, stating, *inter alia*:

- ***Data-Centric and Online Business Model.***   Our data drives revenue, product development, marketing, distribution, operations, and new brand development. It creates a significant competitive advantage in acquiring users digitally, driving our high engagement and improving repeat purchase rates. Since the launch of our first brand, IL MAKIAGE, we have been continuously refining our machine learning models. Our extensive data moat allows us to build machine learning models with zero-example learning capabilities to drive efficiencies and speed to market for new product launches. In turn, our AI capabilities deliver a hyper personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates.

\* \* \*

- ***ODDITY LABS to Power the Discovery and Development of Science-Backed Products***.   We established ODDITY LABS in conjunction with our acquisition of Revela in April 2023 to bring biotechnology and AI-based molecule discovery to beauty and wellness. ODDITY LABS is designed to deepen our competitive advantage by supporting the development of proprietary, science-backed, and high performance products. We believe AI-based molecule discovery is a transformative frontier in product development, driven by the advancements of key enabling technologies, including synthetic biology, genomic sequencing, robotics, and AI, that can support the discovery and development of molecules at speed and scale. We are incorporating Revela's AI-based discovery model into our product development process to accelerate growth across beauty and wellness categories.

(Emphases in original.)

31.     The Offering Documents also downplayed the true scope and severity of Oddity's and/or its subsidiaries' legal issues and related lawsuits.  For example, in a section entitled "Legal Proceedings," the Offering Documents merely stated:

> We are currently involved in, and may in the future be involved in, legal proceedings, claims, and government investigations in the ordinary course of business. These may include proceedings, claims and investigations relating to, among other things, regulatory matters, data privacy and cybersecurity, commercial matters, intellectual property, competition, tax, employment, pricing, discrimination and consumer rights.
>
> The results of any current or future legal proceedings, claims or government investigations are inherently unpredictable and subject to significant judgment to determine the likelihood and amount of loss related to such matters. While it is not possible to predict the outcomes with certainty, based on our current knowledge, we believe that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition and results of operations. Regardless of the final outcome, however, litigation can have an adverse impact on us due to defense and litigation costs, diversion of management resources, reputational harm and other factors.

32.     Indeed, in discussing "[d]isputes and other legal or regulatory proceedings [that] *could* adversely affect our financial results," the Offering Documents stated, in relevant part:

> From time to time, we have been and may in the future become involved in litigation, other disputes, or regulatory proceedings in connection with or incidental to our business, including litigation related to intellectual property, regulatory matters, contract, advertising, and other claims. In general, claims made by us or against us in litigation, disputes, or other proceedings *can* be expensive and time consuming to bring or defend against and could result in settlements, injunctions, or damages that *could* significantly affect our business. It is not possible to predict the final resolution of the litigation, disputes, or proceedings to which we currently are or *may* in the future become party to. Regardless of the final resolution, such proceedings *may* have an adverse effect on our reputation, financial condition, and business, including by utilizing our resources and potentially diverting the attention of our management from the operation of our business.

(Emphases added.)  Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Oddity's actual known risks regarding the true scope and severity of its and/or its subsidiaries' legal issues and related lawsuits, much less the existence of hundreds of lawsuits filed

against the Company and/or its subsidiaries, including multiple class action lawsuits filed within

the past several years.

33.     On August 9, 2023, Oddity issued a press release announcing its second quarter

2023 results (the "2Q23 Earnings Release").  The 2Q23 Earnings Release quoted Defendant

Holtzman, who stated, in relevant part:

> We believe our year-to-date financial performance, with net revenue growth of 69% year-over-year, $50 million of net income, and $70 million of Adjusted EBITDA, reflects the power of our business model as we work to transform the global beauty and wellness market through technology and entrepreneurial DNA . . . . We are unlocking online for this massive, global TAM [total addressable market] by leveraging data science, artificial intelligence, and computer vision to deliver superior products and experiences to our over 40 million users.

34.     On November 7, 2023, Oddity issued a press release announcing its third quarter

2023 results (the "3Q23 Earnings Release").  The 3Q23 Earnings Release quoted Defendant

Holtzman, who stated, in relevant part:

> We continue to deliver excellent growth and profitability for IL MAKIAGE and SpoiledChild, while building powerful engines to scale our business and expand our lead in 2024 and beyond . . . . Our large investments in technology and data capabilities over the past five years are enabling us to continue to grow fast without damaging our high margins and strong profitability.

35.     The 3Q23 Earnings Release also quoted Defendant Mann, who stated, in relevant

part:

> The upside relative to our guidance was driven in part by stronger repeat sales relative to our previous outlook . . . . Our superior financial results in the third quarter reflect the strength of our model, and our significant runway for profitable growth ahead.

36.     On March 5, 2024, Oddity issued a press release announcing its fourth quarter and

full year 2023 results (the "4Q/FY23 Earnings Release").  The 4Q/FY23 Earnings Release quoted

Defendant Holtzman, who stated, in relevant part, that "[o]ur large investments in technology and

10

product over the past 5 years are yielding significant returns and allow the rare combination of scale, growth, and profitability."

37. The 4Q/FY23 Earnings Release also quoted Defendant Mann, who stated, in relevant part, that "because of our high repeat rates, we have high confidence and visibility into achieving our full year 2024 objectives."

38. On March 6, 2024, Oddity filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 20-F"). The 2023 20-F contained substantively the same statements as referenced in ¶¶ 29-30, *supra*, touting Oddity's purported proprietary AI technology and capabilities, while attributing the Company's "repeat purchase rates," purportedly loyal customer base, and overall sales and competitive advantages to its AI-powered and online business model.

39. The 2023 20-F also continued to downplay the true scope and severity of Oddity's and/or its subsidiaries' legal issues and related lawsuits. For example, in a section entitled "Legal Proceedings," the 2023 20-F merely stated:

> From time to time, we may become involved in actions, claims, suits, and other legal proceedings arising in the ordinary course of business, including assertions by third parties relating to intellectual property infringement, breaches of contract or warranties, employment-related matters, regulatory matters, data privacy and cybersecurity, commercial matters, competition, tax, pricing, discrimination and consumer protection.

> The results of any current or future legal proceedings, claims or government investigations are inherently unpredictable and subject to significant judgment to determine the likelihood and amount of loss related to such matters. While it is not possible to predict the outcomes with certainty, based on our current knowledge, we believe that the final outcomes of any pending matters will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition and results of operations. Regardless of the final outcome, however, litigation can have an adverse impact on us due to defense and litigation costs, diversion of management resources, reputational harm and other factors.

40.     Indeed, the 2023 20-F contained the same boilerplate risk warning as referenced in ¶ 32, *supra*, purporting to warn of "[d]isputes and other legal or regulatory proceedings [that] ***could*** adversely affect our financial results," which likewise served as a generic, catch-all provision that was not tailored to Oddity's actual known risks regarding the true scope and severity of its and/or its subsidiaries' legal issues and related lawsuits, much less the existence of hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years.

41.     Appended as exhibits to the 2023 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Holtzman and Mann certified that the 2023 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]"

42.     On May 7, 2024, Oddity issued a press release announcing its first quarter 2024 results (the "1Q24 Earnings Release").  The 1Q24 Earnings Release quoted Defendant Holtzman, who stated, in relevant part, that "[o]ur platform enables our brands to sustain high and profitable growth at large scale across categories, with strong repeat rates and customer satisfaction[.]"

43.     The 1Q24 Earnings Release also quoted Defendant Mann, who stated, in relevant part, that "[o]ur excellent Q124 results, combined with a strong start to Q2 and our continued high repeat rates, allow us to continue our investments in future growth initiatives and raise our full year outlook."

44.     The statements referenced in ¶¶ 29-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Oddity overstated its AI technology and capabilities, and/or the extent to which this technology drove the Company's sales; (ii) Oddity's repeat purchase rates and revenues were, at least in part, derived from unsustainable and deceptive sales and advertising practices; (iii) Oddity downplayed the true scope and severity of ongoing civil litigation against the Company and/or its subsidiaries; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

45.     In addition, the Offering Documents and 2023 10-K were required to disclose material risks regarding Oddity's various legal entanglements, lawsuits, and related issues. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Oddity to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."   Defendants' failure to disclose the likely damage that would result from hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years, violated Item 105 because this issue represented a material factor that made an investment in the Company and its IPO speculative or risky.

46.     For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Oddity to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or

unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose the likely damage that would result from hundreds of lawsuits filed against Oddity and/or its subsidiaries, including multiple class action lawsuits filed within the past several years, violated Item 303 because this issue represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### The Truth Emerges

47.     On May 21, 2024, during pre-market hours, Ningi published a report regarding Oddity, alleging that the Company "completely misled investors about every critical aspect of its business[.]"  With respect to Oddity's purported AI technology and capabilities, the Ningi Report found that, although the Company had "mentioned 'AI' more than 40 times in its F-1 prospectus and has claimed to be leveraging technologies to develop products and interact with customers," its "product-matching technology is akin to 'a normal questionnaire[.]'"  For example, the Ningi Report stated, *inter alia*:

> ODDITY has been talking up its technology to investors for years, highlighting its use of AI in every aspect of the company's operations. On the customer-facing front, ODDITY's use of AI has been mostly attributed to the company's AI quizzes. One of the quizzes states that "*SpoiledBrain AI determines the exact products you need by combining millions of data points with your personal profile.*"[]
>
> **However, we talked to former employees who told us that the AI is nothing but a questionnaire.**
>
> * * *
>
> This was also confirmed by Chief Product Officer [Defendant] Holtzman-Erel, who told a journalist that it is just a quiz of 20 questions.[] During the interview, **co-founder [Defendant] Holtzman herself described it as "*simple questions with four possible answers,*"** and there was no mention of AI.[] In our opinion, the claim that ODDITY is using AI is just a lie, and the company is misleading customers and investors.
>
> Ultimately, ODDITY's 'Powermatch' and 'SpoiledBrain' quizzes are simply rule-based and not artificial intelligence like Microsoft's Copilot, which is what a

consumer would expect by any AI claim that says *"SpoiledBrain AI determines the exact products you need by combining millions of data points with your personal profile."* **ODDITY's AI claim can be refuted on the customer-facing front.**

On the back end, ODDITY states in its SEC filings that *"our AI capabilities deliver a hyper-personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates."*[] However, former employees told us **sales are *"all driven by the performance marketing team"*** and we discovered that ODDITY is using a regular marketing automation platform from Klaviyo.[] It's the same solution from Klaviyo that ODDITY's competitor Coty is using.[] When we did the AI quizzes we entered our email and since then we've been bombarded daily with emails offering free giveaways. Therefore, it is not AI-powered targeting but aggressive performance marketing. **We think that ODDITY's claim of hyper-personalized targeting through AI is refuted as well.**

(Emphases in original.)

48.     Indeed, although Oddity attributed repeat sales and customers to its purported AI technology's ability to generate hyper-personalized product suggestions for customers, the Ningi Report found that Oddity's lauded "repeat purchase rates" are actually attributable to "customers unknowingly enter[ing] into non-cancelable plans" that allow the Company "to recognize repeat purchases in the following quarters even though the customers don't want the product."  For example, the Ningi Report stated, *inter alia*:

Even though ODDITY wants to convey an image of a successful business that uses AI to drive customer loyalty and repeated purchase rates, customers on social media paint a different picture. **Customers call it a fraud and a scam on Better Business Bureau, Facebook, Reddit, and TikTok** and advise other people against buying ODDITY's brands Il Makiage and SpoiledChild.[]

In **a Facebook group called 'Il Makiage is a Fraud' with more than 2,600 members**, users posted dozens of stories about unwarranted charges and other issues.[] One member described a situation that appears to be happening regularly, ***"I called Makiage and since I didn't place the order and am not in their system, they refuse to refund. I had no idea who the company was until my card was charged."***[] In the end, Il Makiage allegedly refuses a refund because the company doesn't have any records of the cardholder being a customer.[] Other group members say that they had to get a new card to stop the unjustified charges.[] **As of May 2024, individuals still complain that their accounts are charged even though they never ordered anything from Il Makiage.**[] Another BBB complaint alleged six *"unauthorized fraudulent charges."*[] On Reddit, users echoed the same

issues of unauthorized charges, with **one user reporting in April 2024 that they were called by their bank's fraud department because of repeated attempts by Il Makiage to charge them.**[] Another Reddit user couldn't order from Il Makiage because the bank labeled the transaction as "suspicious activity."

* * *

[F]ormer employees described Il Makiage's sales practices to us. "*He's [Defendant Holtzman] really good at getting that first consumer in the trap, and he's decent at keeping that consumer in the trap,*" a former manager explained to us, and concluded, "The model is the trap." Former employees told us stories where executives said it was not about ODDITY building a sustainable brand, but an effective trap.

(Emphases in original.)

49.     The Ningi Report provided an example of how Oddity allegedly traps its customers into year-long, unwanted, non-cancellable and non-refundable product plans, drawing from extensive reports of such issues from irate customer complaints on the Better Business Bureau's ("BBB") website:

[A] customer orders an Il Makiage product, and without noticing, enters into a pre-paid plan.[] Upon receiving the product, the customer is not satisfied with the product and will try to cancel the plan. However, as stated in Il Makiage's FAQ, **the customer cannot get out for a year; it is neither cancelable nor refundable.**[] Now the customer is more than upset because she will have to pay for a product she doesn't like and doesn't want, **but ODDITY, on the other end, can report a high repeat purchase rate in the coming three quarters.** How sustainable do you think such a business model is, and do you think the customer will endorse ODDITY's products in her social group? It is more likely that the customer will warn anyone not to buy from ODDITY.

(Emphases in original.)

50.     The Ningi Report also discussed how Oddity had attempted to address the negative reputation of its Il  Makiage business on the BBB website during the Class Period:

ODDITY's hard-to-cancel subscriptions, auto-replenishment orders, concealed pre-paid plans, and unauthorized charges have been reported for years, going back to 2021.[]

In our opinion, ***it appears that ODDITY never changed its deceptive billing and sales practices but allocated resources to a special task force that specifically should resolve complaints on BBB, so it looks like the company has a clean slate.[] That's why Il Makiage's BBB rating went from an 'F' (worst rating possible on BBB) in September 2023 to an 'A+' rating in May 2024.***[] Ultimately, we believe that ODDITY's high repeat purchase rates are coming from shady practices, and it will backfire one way or another.

(Emphasis added.)

51.     An investigation by Plaintiff's counsel revealed that there were a total of 1,402 complaints published on the BBB website regarding Oddity's Il Makiage business within the last three years.[1]  Some of these complaints, published on the BBB website as recently as July and June 2024, related to the same or similar deceptive sales and advertising practices alleged in the Ningi Report, a sample of which are provided below:



**Initial Complaint**
07/02/2024

**Complaint Type:** Sales and Advertising Issues
**Status:** Resolved

I purchased a number of products from Il Makiage makeup company in March. I also returned the items that same month as they were not as good (in my opinion) as some less expensive products and for the money, I felt I could find a better product elsewhere. I then canceled auto shipments and was told by the company in an email that auto replenishments had been canceled. This morning, I was once again charged for a product that I not only did not want , but had been told I would not be charged for again. This is essentially the company stealing money from my bank account and is unacceptable!



**Initial Complaint**
06/28/2024

**Complaint Type:** Sales and Advertising Issues
**Status:** Answered

This company is a scam. They say they have a try before you buy on their makeup, yet they charge you the full price before the makeup even arrives. Then when you try to contact them, there is no response. People need to be aware how disreputable this company is.



**Initial Complaint**
06/28/2024

**Complaint Type:** Service or Repair Issues
**Status:** Answered

06/27/24 PayPal sent me a notification that Il Makage charged $137.03 and I never authorized nor did I have a subscription for my PayPal to be charged automatically. I filed a dispute with PayPal and they claim that the charge is legitimate, which it isnt. I did cancel with PayPal any

---

[1] *See Complaints: Il Makiage*, Better Business Bureau, https://www.bbb.org/us/ny/new-york/profile/beauty/il-makiage-0121-9390/complaints (last visited July 19, 2024).

 **Initial Complaint**                    **Complaint Type:** Product Issues
06/26/2024                              **Status:** Answered ⓘ

I originally attempted a trial period with the company and had to pay a $4.00 shipping fee.
Next thing I know I was charged approximately $65.95. I immediately contacted the
company and they said that it was just some kind of glitch and it will return the money less
the $4 back to my account. Well that never happened. I told them then that I no longer want
their procduct if they will just take what they want from my account. That was back sometime
in late 2021. Here we are 2024 and they have consistently tried to take $65.95 from my
account every 3-4 month since then. I called my bank and the company had created a wallet
with my account. OMG! I disputed the charges and had my bank remove the wallet and put
an alert not to allow this company to charge my account. Well that only lasted about 6
months and it started all over again. Called my bank again and disputed the charges and
remove the wallet again and changed my card number. I have boxes of make-up stockpiling
as I do not use makeup often. Please help me and I am absolutely positive 100's of other
women get this monkey off their back and out of their accounts. The sad part is the makeup
is actually really good. But I refuse to have any company or anyone other than myself just
jacking money out of my account. I have made every attempt from the first $4 to contact
them and make them stop. For a long time I was forwarding from the email they sent me
begging them to stop it but never got a reply to realize that their emails are non repy emails.
I went on the site at one point desparately trying to find a way out and it appeared that I did
so I followed all the prompts just to be led to a dead end that had no resultion, it just
stopped and didn't go any further. It is a farse and it is an insult to women everywhere.
Please help me stop them from doing this to me and anyone else.

52.     Compounding these issues, the Ningi Report asserted that Ningi had "found
hundreds of undisclosed lawsuits filed against ODDITY and its subsidiaries in the US and Israel,
frequently alleging unpaid bills and violations of consumer protection laws." For example, the
Ningi Report stated, *inter alia*:

> Doing business always brings risk with it; outside of geopolitical, staffing, or
> operational risks, there are always legal and regulatory risks associated with
> running a business. **But we were completely astonished after we scoured the
> Israeli court systems to assess the legal risks related to ODDITY's Israeli
> business.**
>
> **We found hundreds of lawsuits – at least 218[] directly connected to ODDITY
> and its subsidiaries – from government agencies, landlords, business partners,
> insurers, suppliers, employees, and customers.**[]

53.     The Ningi Report provided numerous examples of these lawsuits, a sample of
which, as alleged in the Ningi Report, are provided below:

> **To begin with, Il Makiage was sued in several class action lawsuits in 2014,
> 2015, 2016, 2017 (twice), 2021, and 2022.**[] The value in dispute of the class
> actions exceeded more than $10 million.

Investors have seen bad reviews from US customers about ODDITY's billing practices for overcharging for "Try before you buy"-purchases.[] Similar to that**, a class action lawsuit from 2015 alleged that, over the course of two years, the company overcharged a customer for purchases at Il Makiage stores.**[] The scheme allegedly consisted of the cash registers rounding up each product's price by a few cents and charging the higher amount, without the customer noticing.[] For example, when the product price was 445 shekels, Il Makiage would charge the customer's card 449 shekels.[] The company denied any wrongdoing but paid the plaintiff's legal fees and donated some products to a charity.[]

**In 2014, a woman filed a class action lawsuit** against Il Makiage for unsolicited ads she allegedly received via text.[] Next to the class action complaints, we found dozens of individual complaints related to these spam texts or spam mail.[] The damages sued for range from a couple of thousand to several million shekels.[] In the complaints, the plaintiffs stated that they told Il Makiage that they didn't want to receive any advertisements or promotions from the company. However, the spamming allegedly didn't stop.

\* \* \*

Evidence from **two lawsuits filed in 2023 reveals the spam texts that promote Il Makiage's products and services** . . . . That is in stark contrast to ODDITY's claim that *"our AI capabilities deliver a hyper-personalized beauty experience to the customer to drive customer loyalty and repeat purchase rates."*[] **We believe spamming individuals with coupons and discounts via text is not what investors would understand under** *"AI capabilities [to] deliver a hyper-personalized beauty experience."*

(Emphases in original.)

54.     An investigation by Plaintiff's counsel found at least five U.S. lawsuits that have been filed against Oddity's subsidiary IM Pro Makeup NY L.P. d/b/a Il Makiage, at least one of which was a class action.

55.     The Ningi Report also alleged that Defendants were engaged in a pump-and-dump scheme, documenting instances of insider selling by, *inter alia*, Defendant Holtzman in the lead-up to and through the IPO.  For example, the Ningi Report stated:

 In our opinion, ODDITY Tech Inc. is a classic pump-and-dump scheme. We believe that the company, its executives, and its pre-IPO owners embellished the company's story, concealed ugly truths, and jumped on the AI hype to offload their shares to clueless investors. **While CEO [Defendant] Holtzman told investors**

**that ODDITY is a cutting-edge tech company, he reduced his stake in the company from 100 to 32.4 percent (see Figure 31).**[] Without the Class B shares, in which he is the sole owner of share capital, it would be just 15 percent.[]



*Figure 31 Holtzman's ownership in ODDITY Tech Ltd., source: NINGI Research, company data, Israeli Corporations Authority*

The company and its management are touting being a market leader by using what is hot at the moment ("as-a-Service"-Solutions in 2019, Data Science in 2021, Crypto-Coin in 2022, and AI in 2023), but the underlying business is highly reliant on . . . sketchy practices.[] **In our opinion, ODDITY materially misrepresented its business so a chosen few could enrich themselves.**

Prior to the IPO, Holtzman had already sold $128 million in shares to Fidelity, Franklin Templeton, and the Tull Family in January 2022.[] At the time, ODDITY described the private offering as a direct equity investment in the company: "Il Makiage receives $130 million investment at $1.5 billion valuation."[] However, this turned out to be a lie, as ODDITY disclosed the true nature of the transaction in its first draft registration statement: it was a secondary market transaction.[] ODDITY Tech also issued a crypto token in early 2022 but only raised $648,000.[]

**Ultimately, we believe the material misrepresentations helped ODDITY reprice its IPO,** with ODDITY's advisor Latham & Watkins reporting "a very strong investor demand with significant engagement" in a letter to the SEC.[] Ultimately, [Defendant] Holtzman sold $232 million in stock, and L. Catterton sold around $165 million.[] Only $51.3 million went to the company.[]

(Emphases in original.)

56.     As further alleged in the Ningi Report, Defendant Mann also engaged in insider selling through automatic insider selling plans, referred to as 10b5-1 plans.  For example, the Ningi Report stated, in relevant part:

**In the classic fashion of a pump-and-dump scheme, ODDITY even ventured into filing promotional press releases with the SEC, for example, when ODDITY's CFO bought $1 million in stock in September 2023.**[]

* * *

**But three months later, on December 14, 2023, [Defendant] Mann . . . adopted a 10b5-1 plan to sell her shares[.]**

* * *

On March 19, 2024, [Defendant] Mann sold shares worth 577,590 dollars in a single trade, and we estimate the sale accounts for 47.7 percent of her publicly touted September 2023 share purchase.[]

* * *

**We think [Defendant] Mann's 10b5-1 plan adoption went unnoticed by investors to date because this wasn't disclosed in ODDITY's [2023] 20-F form filed with the SEC.**

Ultimately, ODDITY's CFO [Defendant] Mann publicly claimed to do one thing and three months later . . . did the opposite. In addition, we found out that [Defendant] Mann was paid $6 million in cash as a bonus for ODDITY's IPO.[] If the stock is so valuable, why did [Defendant] Mann take a $6 million cash bonus instead of stock-based compensation for the successful IPO, and . . . adopt a stock sale plan?

(Emphases in original.)

57.    The Ningi Report also detailed other instances of insider selling by Company insiders, as well as a preference among them for favoring cash bonuses over stock-based compensation, stating, in relevant part:

More executives started dumping shares after the lock-up period expired on January 14, 2023 [*sic*].

ODDITY's Chief Legal Officer, Jonathan Truppman, immediately started selling and has sold $3.2 million in stock since then.[] A closer analysis of Mr. Truppman's stock sales revealed that he adopted a 10b5-1 plan on September 14, 2023; that's two days after ODDITY filed a press release with the SEC bragging that [Defendant] Mann had purchased $1 million worth of stock because of "her strong confidence in the business."[] As a reminder, [Defendant] Mann also adopted a stock sale plan three months later.[]

The company's Chief Technology Officer, Niv Price, also started dumping his shares after pre-IPO investor Catterton filed a secondary offering to sell 4.7 million shares.

The company boasts about the stock's compelling value, **but ODDITY insiders favor cash bonuses over stock comp and have sold $599 million in shares (see Figure 33 below).**

| Selling party | Event | Date | Shares | Gross dollar amount | Net dollar amount | Average price per share |
|---|---|---|---|---|---|---|
| Pre-IPO shareholders | IPO | 7/18/2023 | 10,350,876 | 362,280,660 | 337,826,715 | $ 32.64 |
| Pre-IPO shareholders | IPO Greenshoe | 7/18/2023 | 1,815,789 | 63,552,615 | 59,262,813 | $ 32.64 |
| Jonathan Truppman | 144 filing | 1/22/2024 | 5,000 | 222,872 | 222,872 | $ 44.57 |
| Jonathan Truppman | 144 filing | 2/6/2024 | 675 | 29,728 | 29,728 | $ 44.04 |
| Jonathan Truppman | 144 filing | 2/8/2024 | 22,610 | 1,016,779 | 1,016,779 | $ 44.97 |
| Jonathan Truppman | 144 filing | 2/9/2024 | 26,630 | 1,202,787 | 1,202,787 | $ 45.17 |
| Jonathan Truppman | 144 filing | 2/12/2024 | 10,085 | 461,305 | 461,305 | $ 45.74 |
| Niv Price | 144 filing | 3/12/2024 | 7,000 | 317,520 | 317,520 | $ 45.36 |
| L Catterton | Secondary | 3/14/2024 | 4,782,609 | 208,043,492 | 198,681,534 | $ 41.54 |
| Lindsay Drucker Mann | 144 filing | 3/18/2024 | 13,000 | 577,590 | 577,590 | $ 44.43 |
| Jonathan Truppman | 144 filing | 5/16/2024 | 6,180 | 272,644 | 272,644 | $ 44.12 |
| **Total** | | | **17,040,454** | **637,977,991** | **599,872,288** | **$ 35.20** |

Figure 33 Stock sold by pre-IPO shareholders and insiders, source: NINGI Research, company filings

In our opinion, ODDITY's insider actions speak louder than any press release. **Everybody is selling while saying that the company has great prospects! Think about that.**

(Emphases in original.)

58.     Also on May 21, 2024, less than an hour before markets closed, Oddity issued a response to the Ningi Report, which failed to rebut, as well as acknowledged the veracity of, certain of the report's allegations, stating, in relevant part:

ODDITY fundamentally rejects the short seller report. The allegations contained in the report by NINGI Research are based on demonstrable factual inaccuracies, incorrect assumptions, and unfounded and malicious speculation. The short seller report was published without any involvement by ODDITY.

* * *

3. *The overwhelming majority of the "hundreds of lawsuits" mentioned in the report are small-claims suits related to our stores' business in Israel.* In the aggregate these total less than $100,000.

4. ODDITY firmly stands behind its use of technology to deliver a personalized beauty experience to consumers to drive conversion, customer loyalty, repeat purchase rates, and business results. Any other claim is purely false. Our investment in technology is the main driver behind the company's massive scale and high profitability as an online business.

5. ODDITY firmly stands behind its strong and positive customer experience, as evident by the tens of thousands of 4 and 5 star reviews on many independent review websites, such as Trustpilot.com, Google, etc. As ODDITY stated on its earnings call – it is important to understand that the consumer claims represent

a fraction of a percent of our sale volume. ODDITY will always continue to address incidents of dissatisfaction and keep its customers satisfied and loyal.

(Emphases added.)

59.     Following publication of the Ningi Report and the Company's response, Oddity's Class A ordinary share price fell $3.02 per share, or 7.37%, to close at $37.97 per share on May 21, 2024.  Indeed, notwithstanding the Company's purported rebuttal, Oddity's Class A ordinary share price continued to decline by an additional $1.30 per share, or 3.42%, over the following two consecutive trading sessions, closing at $36.67 per share on May 23, 2024.

60.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

61.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  Indeed, by overstating Oddity's purported proprietary AI technologies to target consumer needs, the Company and its insiders stood to profit handsomely from Oddity's IPO and the recent hype surrounding AI in the securities markets.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Oddity securities during the Class Period (the "Class"); and were damaged upon the

revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Oddity securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Oddity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Oddity;

- whether the Individual Defendants caused Oddity to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Oddity securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Oddity securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Oddity securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

69.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

70.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

71.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Oddity securities; and

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Oddity securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

74.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Oddity securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Oddity's finances and business prospects.

75.     By virtue of their positions at Oddity, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

76.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Oddity, the Individual Defendants had knowledge of the details of Oddity's internal affairs.

27

77.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Oddity.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Oddity's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Oddity securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Oddity's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Oddity securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

78.     During the Class Period, Oddity securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Oddity securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Oddity securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Oddity securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

28

79.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

81.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     During the Class Period, the Individual Defendants participated in the operation and management of Oddity, and conducted and participated, directly and indirectly, in the conduct of Oddity's business affairs.  Because of their senior positions, they knew the adverse non-public information about Oddity's misstatement of income and expenses and false financial statements.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Oddity's financial condition and results of operations, and to correct promptly any public statements issued by Oddity which had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Oddity disseminated in the marketplace during the Class Period concerning

Oddity's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Oddity to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Oddity within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Oddity securities.

85.     Each of the Individual Defendants, therefore, acted as a controlling person of Oddity.  By reason of their senior management positions and/or being directors of Oddity, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Oddity to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Oddity and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Oddity.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: July 19, 2024                    Respectfully submitted,

                                        POMERANTZ LLP

                                        */s/ Jeremy A. Lieberman*
                                        Jeremy A. Lieberman
                                        J. Alexander Hood II
                                        James M. LoPiano
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (917) 463-1044
                                        jalieberman@pomlaw.com
                                        ahood@pomlaw.com
                                        jlopiano@pomlaw.com

                                        HOLZER & HOLZER, LLC
                                        Corey D. Holzer
                                        (*pro hac vice* application forthcoming)
                                        211 Perimeter Center Parkway
                                        Suite 1010
                                        Atlanta, Georgia 30346
                                        Telephone: (770) 392-0090
                                        Facsimile: (770) 392-0029
                                        cholzer@holzerlaw.com

                                        *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, <u>Brian Hoare</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against ODDITY Tech Ltd. ("Oddity") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Oddity securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Oddity securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Oddity securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** __7/12/2024_____
         **(Date)**

DocuSigned by:

*Brian Hoare*

161F462CA9FB429...

_____
         **(Signature)**

                    Brian Hoare
_____
         **(Type or Print Name)**

**Oddity Tech Ltd. (ODD)**                                                                 **Brian Hoare**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 3/7/2024 | 67 | $44.5200 |
| Purchase/Acquisition | 3/7/2024 | 0.383 | $44.7100 |
| Purchase/Acquisition | 3/15/2024 | 0.407 | $43.8500 |
| Purchase/Acquisition | 3/15/2024 | 11 | $43.8300 |
| Sale | 5/3/2024 | (28) | $34.5300 |
| Sale | 5/3/2024 | (0.958) | $34.5200 |